# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

EDGAR MARTINEZ

DOCKETED DEC 2 9 2004

FILED Aug 9, 2004 AUG 9 2004 MICHAEL W. DOBBINS CLERK, U.S. DISTRICT COURT

MAGISTRATE JUDGE DENLOW

04CR0720

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief:

**Count One**

Beginning on a date unknown and continuing until on or about June 1, 2004, in Chicago, and elsewhere, in the Northern District of Illinois, defendant EDGAR MARTINEZ did conspire with others to knowingly and intentionally possess with intent to distribute and to distribute a controlled substance, namely, in excess of 5 kilograms of mixtures containing cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 846.

**Count Two**

On or about June 1, 2004, in Chicago, in the Northern District of Illinois, defendant EDGAR MARTINEZ did knowingly and intentionally possess with intent to distribute a controlled substance, namely, approximately thirty kilograms of mixtures and substances containing cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

I further state that I am a Special Agent, Federal Bureau of Investigation, and that this complaint is based on the following facts:

Please see attached affidavit.

Continued on the attached sheet and made a part hereof:  X  Yes  ___ No

Courtenae Trautmann
Courtenae Trautmann, Special Agent, FBI
Signature of Complainant

Sworn to before me and subscribed in my presence,

August 9, 2004                                    at      Chicago, Illinois
                                                          City and State

Morton Denlow
Morton Denlow, Magistrate Judge                           Signature of Judicial Officer
Name & Title of Judicial Officer

STATE OF ILLINOIS    )
                     ) SS
COUNTY OF COOK       )

## AFFIDAVIT

I, COURTENAE TRAUTMANN, being duly sworn, deposes and states as follows:

1.  I am a Special Agent with the Federal Bureau of Investigation, and have been so employed by the FBI for approximately five years. In connection with my official FBI duties, I am currently assigned to a joint FBI and Drug Enforcement Administration (DEA) task force that investigates criminal violations of the federal narcotics laws, including but not limited to Title 21, United States Code, Sections 841, 843, 846 and 848. I have also been involved in various types of investigations, and in the debriefing of defendants, witnesses, informants, and others who have knowledge of narcotics trafficking, and of the laundering and concealing of proceeds of drug trafficking defendants. I have received specialized training in the enforcement of laws concerning the activities of narcotics traffickers.

2.  This Affidavit is made for the limited purpose of showing probable cause in support of the complaint charging EDGAR MARTINEZ with violating 21 U.S.C. §§ 841 and 846. Because this Affidavit is for the limited purpose of establishing probable cause to support the complaint, it contains only a summary of relevant facts. I have not included each and every fact known to me concerning the individuals and events described in this Affidavit.

3.  I have received special training in all aspects of the enforcement of laws concerning controlled substances as found in Title 21 of the United States Code (U.S.C.), including but not limited to, the authorized interception of wire communications, the use of pen registers, undercover operations, various types of surveillance, debriefing of defendants, witnesses, and informants having knowledge of the distribution and transportation of controlled substances, and the laundering and

concealing of proceeds from drug trafficking. As a FBI Special Agent, I have participated in a number of drug trafficking investigations. Based on my training and experience, I am familiar with the ways in which drug traffickers and their associates conduct their drug-related business, including but not limited to: their methods of distributing drugs, techniques to launder drug proceeds, and their use of codes and code words to identify themselves and the nature of their communications.

4. The information contained in this Affidavit is derived from Affiant's knowledge of and prior experience in drug investigations; information obtained during interviews with numerous drug traffickers, gang members and confidential informants conducted by Affiant and other law enforcement officers; and information obtained by the Affiant from other local, state and federal investigators experienced in drug investigations. As a result of my participation in this investigation, my interviews with and review of reports prepared by agents in the DEA, FBI as well as other federal and local agencies and other law enforcement agents and officers, I am familiar with all aspects of this investigation as described in this Affidavit. The information contained in this Affidavit includes the results of physical surveillance; information provided by cooperating witnesses ("CWs"); agents' interviews of witnesses; agents' review of recordings of consensually recorded conversations and conversations intercepted pursuant to Court orders authorizing the interception of wire communications; and review of statements of witnesses and defendants. The recitation of facts contained in this Affidavit is not meant to be a complete narrative of all that has occurred in connection with this investigation, but is only a summary of facts necessary to show probable cause

5. This Affidavit is made for the limited purpose of showing probable cause that starting no later than in or around March 2004 to on or about August 2, 2004, EDGAR MARTINEZ, aka "Eddie," Gabriel Garcia, and Co-conspirator A: (1) conspired with each other and with others known

and unknown to knowingly and intentionally possess with intent to distribute and distribute controlled substances, and possessed with intent to distribute and distributed controlled substances, namely, in excess of 30 kilograms of cocaine, and marijuana, in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and in violation of Title 18, United States Code, Section 2; and (2) knowingly and intentionally possessed with intent to distribute and distributed controlled substances, namely, in approximately 30 kilograms of cocaine, in violation of Title 21, United States Code, Section 841(a)(1), and that there is probable cause to arrest EDGAR MARTINEZ. Because of this Affidavit's limited purpose, it is only a summary of facts and does not contain all of the facts known about the events and individuals described.

6. As an FBI Special Agent, I have participated in a number of drug trafficking investigations. Based on my training and experience, I am familiar with the ways in which street drug traffickers and their associates conduct their gang and drug related business, including, but not limited to: their methods of distributing drugs, their use of telephones, their use of codes and code words to identify themselves and the nature of their communications, their methods of establishing and maintaining territory in which to distribute drugs.

7. The information contained in this Affidavit is derived from Affiant's knowledge of and prior experience in drug investigations; information obtained during interviews with numerous drug traffickers, gang members and confidential informants conducted by Affiant and other law enforcement officers; and information obtained by the Affiant from other local, state and federal investigators experienced in drug investigations. As a result of my participation in this investigation, my interviews with and review of reports prepared by agents in the DEA, FBI, and IRS as well as other federal and local agencies and other law enforcement agents and officers, I am familiar with

all aspects of this investigation as described in this Affidavit. The information contained in this Affidavit includes the results of physical surveillance; information provided by cooperating witnesses ("CWs"); agents' interviews of witnesses; agents' review of recordings of consensually recorded conversations and conversations intercepted pursuant to Court orders authorizing the interception of wire communications; and review of statements of witnesses and defendants. The recitation of facts contained in this Affidavit is not meant to be a complete narrative of all that has occurred in connection with this investigation, but is only a summary of facts necessary to show probable cause.

## II. BACKGROUND OF THE INVESTIGATION

8. This investigation has revealed the following about the roles of the defendants in the charged conspiracy:

    a. **EDGAR MARTINEZ** is a supplier of cocaine who, during the course of this conspiracy has conducted multi-kilogram narcotics transactions. **EDGAR MARTINEZ** supplied multi-kilogram quantities of cocaine to Co-conspirator A[1] on multiple occasions (totaling in excess of 50 kilograms of cocaine), and to others yet unknown during the course of this conspiracy.[2]

### A. COURT AUTHORIZED WIRE INTERCEPTIONS

9. During the course of this investigation, the FBI and DEA have obtained authorization to intercept the wire communications over a variety of target phones. On January 13, 2004, this

---

[1] Co-conspirator A has been informed by the government that he will be indicted on federal drug trafficking charges in the future and has agreed to cooperate with the government in the hopes of receiving a reduced sentence.

[2] Gabriel Garcia has been charged in a separate complaint.

4

Court[3] signed an order authorizing the interception of wire communications over a cellular telephone used by Co-conspirator A. During the government's interception of this first cellular telephone used by Co-conspirator A, it learned that Co-conspirator A also utilized a second cellular telephone to conduct his wholesale drug trafficking operation. Accordingly, on February 6, 2004, this Court entered an order authorizing the interception of wire communications on this second cellular telephone used by Co-conspirator A. On February 11, 2004, and subsequently on March 11, 2004, April 9, 2004, and May 3, 2004, the government sought, and this Court approved, orders allowing the FBI to continue intercepting wire communications over the first cellular telephones used by Co-conspirator A for additional 30 day periods. On March 5, 2004, April 2, 2004, and May 3, 2004, the government also sought, and this Court again approved, orders allowing the FBI to continue intercepting wire communications over the second cellular telephone used by Co-conspirator A for an additional 30 days.

10. On or about May 31, 2004, at approximately 12:16 p.m. (Call No. 2707), Co-conspirator A received a call on over the first cellular telephone from EDGAR MARTINEZ, aka "Eddie," who was using a prepaid cellular telephone ((312) 927-9755).[4] During this call,

---

[3] The reference to "this Court" means Chief Judge Charles P. Kocoras or another United States District Court Judge serving as Acting Chief Judge.

[4] Co-conspirator A identified MARTINEZ's residence to law enforcement (92 Kenilworth Court in Romeoville, Illinois). Co-conspirator A only knew MARTINEZ only as "Eddie," and, during the course of this investigation, the FBI and DEA previously heard Co-conspirator A refer to MARTINEZ as "Eddie" during the Court authorized interception of calls over Co-conspirator A's cellular phones. Co-conspirator A told law enforcement that he had previously been inside MARTINEZ's residence and, there, he and MARTINEZ discussed drug trafficking. Subsequently, the FBI learned from the United States Postal Service that EDGAR MARTINEZ lived at the 92 Kenilworth Court address with his wife. Thereafter, the FBI and DEA obtained EDGAR MARTINEZ's driver's license photograph from the Illinois Secretary of State, which also had a listed address of 92 Kenilworth Court in Romeoville, Illinois, and showed that photograph along

MARTINEZ told Co-conspirator A "...the people called me and told me, that they already took care of them, that they have 3-0 [30] do you want them? The ones that are fucking good." Co-conspirator A then responded "Well yeah, I think so because . . ." MARTINEZ interrupted and stated "It's just they barely took care of them and the guy just called me and since I went camping, I just got back and they've been calling and calling to find out if I wanted them if not, he would give them to someone else. There are 3-0 and they're real pretty." Co-conspirator A replied "Yeah," and MARTINEZ again asked "Well should I get the 3-0?" Co-conspirator A then agreed "Yeah." Co-conspirator A also explained "You're gonna have to...we're gonna have to again the same thing to....I don't know when it's going to happen again." MARTINEZ then asked "Okay, so do you have the tickets for those 3-0," and Co-conspirator A responded "Yes." MARTINEZ then stated "Okay, so then let me tell yes and I'll come over in a little while to see how we do it....so you can tell me how you want to do it." Co-conspirator A then agreed.

11.  Based upon my experience and this investigation, MARTINEZ offered to sell Co-conspirator A 30 kilograms of cocaine ("I just got back and they've been calling and calling to find out if I wanted them if not, he would give them to someone else. There are 3-0 and they're real pretty." ). Co-Conspirator A agreed to purchase the 30 kilograms and MARTINEZ asked Co-conspirator A if he had customers lined up to purchase the 30 kilograms ("Okay, so do you have the tickets for those 3-0."). Finally, MARTINEZ and Co-conspirator A agreed to meet in person to make the logistical arrangements to conduct the 30 kilogram transaction ("Okay, so then let me tell

---

with a series of others to Co-conspirator A. Co-conspirator A identified driver's license photograph of MARTINEZ and identified him as the person he purchased 30 kilograms of cocaine from on June 1, 2004.

6

yes and I'll come over in a little while to see how we do it....so you can tell me how you want to do it.").

12. On or about May 31, 2004, at approximately 5:32 p.m. (Call No. 2717), during a subsequent phone call over Co-conspirator A's first cellular telephone, Co-conspirator A and MARTINEZ agreed to conduct this transaction the following day (June 1, 2004). Specifically, MARTINEZ asked Co-conspirator A "But, what, is it going to be done today, or not," and Co-conspirator A replied "No I think....tomorrow."

13. On June 1, 2004, at approximately 11:20 a.m., law enforcement surveillance from the Federal Bureau of Investigation (FBI), Drug Enforcement Administration (DEA), and other local law enforcement agencies was established in the 3100 block of South Hamlin Avenue in Chicago, Illinois. A white Lexus sedan, Illinois license plate KIDS 184 and a Green Dodge Intrepid, Illinois license plate 6759586 were seen leaving this location at the same time. A check of Illinois Secretary of State records revealed that Co-conspirator A was the registered owner of the white Lexus, and that Gabriel Garcia was the registered owner of the green Dodge Intrepid. The white Lexus was being driven by Co-conspirator A and the green Dodge Intrepid was being driven by EDGAR MARTINEZ.

14. On this same date, at approximately the following times, surveillance agents observed the following in Chicago, Illinois: (a) at 12:15 p.m., Co-conspirator A drive the white Lexus in the area of 55th and Archer Avenue; (b) at approximately 12:35 p.m., the green Dodge Intrepid parked (unoccupied) on 55th Street east of Mobile Street; (c) at approximately 12: 42 p.m., Co-conspirator A driving the white Lexus, with Gabriel Garcia in the passenger seat, pick up EDGAR MARTINEZ

7

at the intersection of Mobile Street and 55th Street;[5] and (d) at approximately 12:45 p.m., Garcia driving the green Dodge Intrepid eastbound on 55th Street one to two blocks east of where the Intrepid had been parked (unoccupied) on 55th.[6]

15. On or about June 1, 2004, at approximately 1:28 p.m. (Call No. 2754), Co-conspirator A and Gabriel Garcia had a conversation that was intercepted over the first cellular telephone used by Co-conspirator A. During this call, Co-conspirator A asked Garcia "Listen....listen....have you seen anybody who could had follow you?" Garcia stated "No, because I went through different ways. Co-conspirator A continued "Because...You know what?...Fuck...the same thing is happening to me again. I'm...Yeah, fuck. Are you sure nobody, right?" Garcia again replied "Nobody, I mean...I took...what do you call it?...like...different ways. I drove three(3) blocks and then I turned, and I paid attention to see who was following me and all that and then...what do you call it? And then I turned. Two (2) or three (3) blocks later I turned again, and the I drove three(3) or four (4) blocks more and I turned a different way and nobody was following me." Co-

---

[5] At approximately 12:30 p.m., over Co-conspirator A's first cellular telephone (Call No. 2745), he and MARTINEZ had a conversation about where MARTINEZ was located. MARTINEZ told Co-conspirator A that he was walking on 55th towards Cicero and Co-conspirator A told MARTINEZ that he (Co-conspirator A) would pick MARTINEZ shortly.

[6] At approximately 12:52 p.m., Gabriel Garcia called Co-conspirator A on his first cellular telephone (Call No. 2749). During this call, Garcia asked Co-conspirator A when he was going to pick up the cocaine they had received from MARTINEZ ("Are you going to come back over here or are we just going to do it later?"). Garcia also assured Co-conspirator A that the cocaine was in a safe location ("It's already in...."). Co-conspirator A questioned Garcia if he noticed anything on his way to the location where he was storing the drugs ("All right. Hey, but you. You didn't notice any. Anybody?"). Garcia responded "No, no. That's why I always take that little small street, because. To make sure, you know, that little small street." Co-conspirator A continued to question Garcia about whether he was followed after the drug transaction ("There was nobody behind you. Right?"). Garcia responded, "Yeah. I. That's the thing. I turned on different blocks, so that way I could check." Co-conspirator A continued to question Garcia about whether anyone had followed him ("Everything looked fine, right?"), and Garcia responded affirmatively.

conspirator A stated "Because...because...I'm almost positive man, that...that...something is going on." Later, Garcia asked Co-conspirator A "Do you...you don't think that it is five (5), O (0)?" Co-conspirator A then stated, "Well, I don't know. I don't know. Right now is only a fucking old hag. Fuck, I don't know...I'm almost certain that it is going to be. Man, fuck. Uh...um...yeah...It is going to be that fucking old hag." Co-conspirator A also asked Garcia "Hey, did you close the garage door good and all that...the garage, right?" Garcia responded, "Yeah, and the car too, everything."

16. Based upon my experience and this investigation, Co-conspirator A again asked Garcia if he was followed from the drug transaction they had just completed ("Listen....listen....have you seen anybody who could had follow you?"). Garcia again replied that he had not been followed and explained the counter-surveillance techniques that he had employed as he left the drug transaction (""Nobody, I mean...I took...what do you call it?...like...different ways. I drove three(3) blocks and then I turned, and I paid attention to see who was following me and all that and then...what do you call it? And then I turned. Two (2) or three (3) blocks later I turned again, and the I drove three(3) or four (4) blocks more and I turned a different way and nobody was following me."). Garcia asked Co-conspirator A if he (Co-conspirator A) thought the police were following him (""Do you...you don't think that it is five (5), O (0)?" [Five-O is a street term for police]). Finally, Co-conspirator A asked if Garcia closed the garage door where the car with the drugs was located (""Hey, did you close the garage door good and all that...the garage, right?"). Garcia responded affirmatively ("Yeah, and the car too, everything.").

17. On June 1, 2004, at approximately 11:30 a.m., law enforcement surveillance from the Federal Bureau of Investigation (FBI), Drug Enforcement Administration (DEA), and other local law enforcement agencies was established in the area of 5258 South Central Avenue in Chicago, Illinois.

18. Subsequent to the events described in paragraph four above, special agents of the FBI and DEA subsequently went to 5258 South Central Avenue in Chicago, Illinois. At the residence the agents spoke with Gabriel Garcia, and Garcia told the agents that he owned the green Dodge Intrepid he was seen driving earlier that day.

19. Garcia also told special agents of the FBI and DEA, that 5258 South Central Avenue in Chicago, Illinois was the residence of his parents.

20. While at 5258 South Central Avenue in Chicago, Illinois, the agents also interviewed Individual A who identified himself as Gabriel Garcia's father and stated that:

(a) he owned the residence located at 5258 South Central Avenue in Chicago, Illinois and that his son Gabriel Garcia kept a vehicle at the residence;

(b) earlier that day he had helped Gabriel Garcia push another vehicle out of the garage in his residence, and Gabriel Garcia then drove the green Dodge Intrepid into the garage; and

(c) he had never seen the green Dodge Intrepid before June 1, 2004.

21. Gabriel Garcia subsequently signed a written consent authorizing the FBI to search the detached garage (and the vehicles located within the garage) at 5258 South Central Avenue in Chicago, Illinois.

22. The FBI, after receiving this consent, searched the garage and located the green Dodge Intrepid which GARCIA was seen driving earlier that day, and a black Lincoln Continental. Gabriel Garcia also told agents that he owned the black Lincoln Continental.

23. The FBI's search of the green Dodge Intrepid revealed, among other things, that the car contained a "trap" (a hidden compartment often used by drug traffickers to conceal drugs and

Case: 1:04-cr-00720 Document #: 1-2 Filed: 08/09/04 Page 12 of 15 PageID #:12

drug proceeds). This "trap" could be opened by utilizing a magnet that operated a hydraulic opening system. The agents along with officers from the Chicago Police Department were able to operate and open the "trap" in the green Dodge Intrepid and discovered, among other things, approximately 30 brick-shaped objects, wrapped in brown adhesive and clear plastic tape believed to be individually wrapped kilograms of cocaine. The 30 brick-shaped objects were subsequently weighed and one brick was opened. The opened brick contained a white, powdery substance, and each brick weighed approximately one kilogram. The substance within the opened brick field-tested positive for cocaine.

24. On or about June 1, 2004, at approximately 7:33 p.m. (Call No. 2791), Co-conspirator A received a call on his first cellular telephone from EDGAR MARTINEZ who was using the prepaid cellular telephone number (312) 927-9755. During this call, MARTINEZ asked Co-conspirator A "What's up? How are you? Or what?" Co-conspirator A responded, "No. Well. We are trying to find out. To see what's going on. MARTINEZ then stated "Well, I don't know. I talked to my people a little while ago, and everything is fine." MARTINEZ continued "But everything is fine [Co-conspirator A]. I don't know what's happening to you, man. Co-conspirator A then responded "Yeah. Eh. Let me investigate and I'll call you back." MARTINEZ reiterated that Co-conspirator A should keep him informed as to what was happening, "But call though. Don't leave me there wondering also, because then I'll get nervous."

25. On or about June 1, 2004, at approximately 7:33 p.m. (Call No. 2791), Co-conspirator A received a call on his first cellular telephone from EDGAR MARTINEZ who was using the prepaid cellular telephone number (312) 927-9755. During this call, Co-conspirator A informed MARTINEZ that Garcia was arrested and that they [the police] took everything. MARTINEZ

11

responded by stating that he believed that it was a coincidence that they [the police] got him there. MARTINEZ also stated that everything was "quiet" his way and that if he was being was being watched (by the police" he would have "been in the mess also." Co-conspirator A then stated he was investigating where Garcia was being held. MARTINEZ stated that he did not understand what was happening to Co-conspirator A because he talked to his (MARTINEZ's) people and they were fine. Co-conspirator A told MARTINEZ to be careful if he went anywhere and to make sure he "watches out." Finally, MARTINEZ told Co-conspirator A to find out exactly what was going on and that they would meet the following day to conduct another 30 kilogram transaction.

26. Later that day and the following day, Co-conspirator A, after being advised of his Miranda rights, and after waiving those rights both orally and in writing, was interviewed by special agents of the FBI and DEA. During these interviews, Co-conspirator A admitted that:

(a) he had agreed to purchase 30 kilograms of cocaine from EDGAR MARTINEZ for a price of $17,500 per kilogram ($ 525,000 total);

(b) on June 1, 2004, he met with EDGAR MARTINEZ in the vicinity of 3131 South Hamlin Avenue, in Chicago, Illinois;

(c) EDGAR MARTINEZ, pursuant to their prior arrangement, then drove the green Dodge Intrepid to an unknown location where EDGAR MARTINEZ loaded the 30 kilograms of cocaine into the trap of the green Dodge Intrepid;

(d) pursuant to a prior arrangement, EDGAR MARTINEZ then brought the green Dodge Intrepid back to the area 55th and Archer with the 30 kilograms of cocaine inside the trap of the green Dodge Intrepid;

12

(e) on June 1, 2004, Co-conspirator A made arrangements with Gabriel Garcia (who he referred to as "Squatty") to store the green Dodge Intrepid containing the cocaine at Garcia's mother's garage near the intersection of Central Avenue and Archer Avenue in Chicago, Illinois;

(f) on June 1, 2004, Co-conspirator A drove Garcia to where the green Dodge Intrepid had been parked (after the cocaine had been placed in the trap of the vehicle by EDGAR MARTINEZ) and Gabriel Garcia then drove the Intrepid to his mother's garage; and

(g) Co-conspirator A admitted that he was going to distribute the cocaine contained within the trap of the green Dodge Intrepid after receiving it back from Gabriel Garcia.


29.  Based on the above, there is probable cause to believe that EDGAR MARTINEZ, Gabriel Garcia and Co-conspirator A violated Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Section 2.

FURTHER AFFIANT SAYETH NOT.

*Courtenae Trautmann*
Courtenae Trautmann, Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN before me this 9th day of August 2004.

*Morton Denlow*
HONORABLE MORTON DENLOW
United States Magistrate Judge